## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**Linda Elmore,**                                       )
)
    **Plaintiff,**                                )
)
      **v.**                                   )     **Civil No. 14-cv-000915 (APM)**
)
**Washington Metropolitan Area Transit**                )
**Authority,**                                          )
)
    **Defendant.**                                )
_____)

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

Plaintiff Linda Elmore filed this lawsuit against her former employer, Defendant Washington Metropolitan Area Transit Authority ("WMATA"), alleging gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.  Plaintiff, who worked as an officer in WMATA's Police Department's canine ("K-9") unit, asserts that members of that unit discriminated against her during a "long-bite" training exercise.  Such training seeks to teach police dogs to pursue and apprehend suspects from long distances.  Plaintiff served as a "decoy" during the exercise.  Although given a protective suit to wear, Plaintiff suffered significant injuries to her neck and back after multiple dog attacks knocked her to the ground.  Plaintiff claims that her maltreatment and injuries were inflicted because she is a woman and because she previously had filed a gender discrimination complaint against her fellow officers, which led to harsh criticism of the K-9 unit's culture and professionalism.

Defendant WMATA sees things differently.  It argues that Plaintiff's participation in the long-bite training exercise and her resulting injuries were not caused by intentional discrimination.

Rather, Plaintiff participated in the training for a legitimate, non-discriminatory reason—all K-9 officers, both male and female, serve as decoys to train the unit's police dogs. Plaintiff's injuries were an unfortunate byproduct of the training, so says WMATA, not the result of invidious discrimination.

This matter is before the court on WMATA's Motion for Summary Judgment. Having reviewed the evidence, the court finds that a reasonable jury could conclude that WMATA employees retaliated against Plaintiff during the training exercise at issue because she had engaged in protected activity. The court also finds, however, that no reasonable jury could conclude that those same WMATA employees discriminated against Plaintiff based on her gender. The court therefore grants in part and denies in part Defendant's Motion for Summary Judgment.

## II.   BACKGROUND

### A.   Factual Background

Plaintiff's Opposition brief narrows the facts that the court must consider to resolve Defendant's Motion for Summary Judgment. Although in her Complaint and in the discovery produced, Plaintiff asserted a number of adverse actions that formed the basis of her discrimination claims, she relies on one event only—the long-bite training—to get past summary judgment.[1] *See* Plaintiff's Opp'n to Def.'s Mot. for Summ. J., ECF No. 15 [hereinafter Pl.'s Opp'n], at 5-6. Therefore, the court considers, in the light most favorable to Plaintiff, only those facts relevant to her discrimination claims arising from the long-bite training exercise.

---

[1] Defendant has moved for summary judgment as to all other alleged adverse events identified in Plaintiff's Complaint and in discovery. *See generally* Defendant WMATA's Motion for Summary Judgment, ECF No. 14. Plaintiff, however, has offered opposition only as to the long-bite training exercise. *See generally* Plaintiff's Opposition to Defendant WMATA's Motion for Summary Judgment, ECF No. 15. The court, therefore, treats as conceded Defendant's motion as to all alleged adverse events other than the long-bite training. *See Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) (citations omitted) ("It is well established that if a plaintiff fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded.").

### 1.    *Events Preceding the Long-Bite Training Exercise*

Plaintiff Linda Elmore began working for Defendant WMATA's Metropolitan Transit Police Department ("MTPD") as a police officer in 2002.  Def's Mot. for Summ. J., ECF No. 14 [hereinafter Def.'s Mot.], Statement of Material Facts Not in Dispute, ECF No. 14 [hereinafter Def.'s Stmt.], ¶ 1; Pl.'s Opp'n, Statement of Disputed Material Facts, ECF No. 15 [hereinafter Pl.'s Stmt.], ¶ 1.  Six years later, in February 2008, Plaintiff became a MTPD K-9 handler.  Def.'s Stmt. ¶ 2; Pl.'s Stmt. ¶ 2.

One of Plaintiff's colleagues in the K-9 unit was Officer Paul Ludwig, who was among the officers responsible for organizing and executing the training of police canines.  Def.'s Mot., Ex. 5, Dep. of Officer Paul Ludwig, ECF No. 15-5 [hereinafter Ludwig Dep.], at 127.  At a meeting in July 2011, Officer Ludwig allegedly "yell[ed]" at Plaintiff, "[got] in [her] face," and "slam[med] his fists down," which "[came] close to [Plaintiff's] face in a threatening manner."  Pl.'s Opp'n, Ex. 9, Formal Complaint of Age and Sex Discrimination and Retaliation to EEOC, November 2, 2012 [hereinafter Formal EEOC Charge], at 2.  Plaintiff tried to leave the meeting, but another officer forced her to stay.  *Id.*  As a result of that episode, Plaintiff filed a formal discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") in August 2011.  *Id*. ¶¶ 45-46; Def.'s Mot., Ex. 10, Office of Civil Rights Formal Discrimination Complaint, August 10, 2011, ECF No. 14-10.  The complaint alleged that Officer Ludwig and other officers had discriminated against Plaintiff "based on her gender (female)" and "age (over 40)," with the most recent instance occurring at the July 2011 meeting.  Def.'s Mot., Ex. 10

An investigation ensued.  After multiple interviews of Plaintiff, Ludwig, and others, a WMATA Senior EEO Dispute Resolution Officer, Beverly Pollard, prepared a report dated March 29, 2012.  Pollard found that what was once a "strong professional relationship" between Plaintiff

and Ludwig had deteriorated quickly, culminating in the July 2011 meeting where "extenuating circumstances" led to their disagreement. Pl.'s Opp'n, Ex. 6, ECF No. 15-7, at 9. She concluded that no discrimination based on gender or age took place, but there was "inappropriate" behavior within the K-9 unit that made 'it difficult for [Plaintiff] and others to perform their duties at their highest levels." *Id.* According to the report, "[t]hese behaviors undermine[d] the goals and objectives of MTPD and should not be ignored." *Id.* Pollard recommended that the officers of the K-9 unit, "no later than June 2012," "participate in training including, but not limited to Diversity, Interpersonal Communication Skills, Conflict Resolution and Team-Building." *Id.*

In parallel with her investigation, Pollard attempted to resolve the acrimony between Plaintiff and Ludwig. Pl.'s Opp'n, Ex. 5, ECF No. 15-6, at 1-4. Plaintiff and Ludwig attended mediation sessions, after which Pollard drafted a "memorandum of understanding," under which Plaintiff and Ludwig would have agreed to respect and treat one another fairly. *Id.* at 8-10. Pollard made repeated attempts between late February and early April 2012 to secure Plaintiff's and Ludwig's signatures to the memorandum. *Id.* at 5-14. Ludwig apparently never signed the document. *See* Pl.'s Opp'n, at 6. It is unclear whether Plaintiff ever signed it.

According to Plaintiff, the investigation and its aftermath only heightened tensions between Plaintiff and Ludwig. On or about June 1, 2012, Plaintiff claims that she reached out to an EEO counselor "asking for help" because she believed that Ludwig and another WMATA officer, Sargent Douglas Haymans, "were planning to injure" her. Pl.'s Resps. to Def.'s First Set of Interrogs. and Disc. Doc. Produc. Demands, ECF No. 15-5 [hereinafter Pl.'s Interrog.], at 3-4. Plaintiff, however, has provided no context or explanation for what prompted her alarm. A few days later, on June 5, 2012, Plaintiff, along with Pollard, met with WMATA Chief Michael Taborn

to express Plaintiff's concerns about the "danger involved in training." *Id.* at 4.  According to

Plaintiff, Taborn was "distant and uncaring" about her fears.  *Id.*

Then, in mid-June 2012, according to Plaintiff, Ludwig and Haymans scheduled mandatory

training on days when they knew Plaintiff was on approved leave.  *Id.*  Someone—Plaintiff does

not specify whom—informed her that, if she did not attend the training, "changes would be made."

*Id.*

### 2.   *The Long-Bite Training Exercise*

Shortly thereafter, on June 27, 2012, Plaintiff participated in a long-bite training with other

officers from the K-9 unit.  What took place during the long-bite training forms the crux of

Plaintiff's claims.

Police dogs used by the K-9 unit are trained to be aggressive.  They must be able to subdue

suspects and yet remain responsive to their handlers' commands.  Pl.'s Stmt. ¶¶ 20-23; Def.'s Stmt.

¶¶ 20-23; Def's Mot., Ex. 1, Dep. of Linda Elmore, ECF No. 14-1 [hereinafter Elmore Dep.], at

10.  One method of training the dogs is known as the "long-bite" exercise.  Its purpose is to teach

the dogs to apprehend suspects from long distances and then release them upon command.  Pl.'s

Stmt. ¶ 39; Def.'s Stmt. ¶ 39.  During long-bite training, one officer—wearing either a protective

sleeve or a full-body suit—serves as a decoy for the dogs by imitating a suspect running from law

enforcement.  Ludwig Dep., at 72.  Another officer then orders his or her canine to chase after and

subdue the decoy and then release the decoy upon command.  *Id*. at 76; Elmore Dep., at 105.

Police canines can weigh anywhere from 70 to 105 pounds.  *See* Def.'s Mot., Ex. 8, Email from

Paul Ludwig to Earl P. Brown, Dewayne G. McGowan, and Andrew Keahon, April 20, 2010, ECF

No. 14-8. It is, therefore, not unusual for the officer serving as a decoy to be knocked to the ground

by a charging canine running full-speed.  Elmore Dep., at 105-6; Pl.'s Stmt. ¶¶ 50-51; Def.'s Stmt.

¶¶ 50-51.  All officers in the K-9 unit participate as decoys, including female officers.  Ludwig Dep., at 77-78; Pl.'s Stmt. ¶ 42; Def.'s Stmt. ¶ 42.  Despite the physical risks involved, K-9 unit members are not required to attend any professional decoy training before serving as decoys.  Pl.'s Stmt. ¶ 41; Def.'s Stmt. ¶ 41.

On June 27, 2012, Plaintiff, Ludwig, Haymans, and other officers in the K-9 unit traveled with their dogs to a training facility in Maryland.  Elmore Dep., at 92.  During the training session that followed, Plaintiff served as a decoy for the other officers' canines.  Ludwig Dep., at 95.  Plaintiff, who is about 5'5" tall and weighs about 135 pounds, put on a full-body suit that was too large for her and inhibited her movement.  Elmore Dep., 107-10.  Haymans' dog charged and struck Plaintiff, causing her to be "whipped around and her head [to] bounce[ ] off the ground."  Formal EEOC Charge at 3.  The blow to Plaintiff's head "render[ed] her unconscious and injur[ed] her."  Pl.'s Interrog., at 5.

Plaintiff's unconsciousness presumably was momentary, as she was able to rise and serve as a decoy again.  Formal EEOC Charge, at 3.  This time Ludwig's dog charged her and knocked her down "so hard she could not get back up."  Id.  One of the officers present, Mark Sarrichio, offered to take over decoy duties from Plaintiff, but Haymans said that Plaintiff would have to "go[ ] again."  Id.  Sarrichio's dog then chased after Plaintiff and again she was hit "very hard."  Id.  Plaintiff finally told Haymans she had had "enough abuse."  Id.  Haymans then ordered Plaintiff to continue the long-bite training, although not as a decoy, but rather by releasing her dog to attack a new decoy.  Id.

Defendant has not disputed Plaintiff's account of what occurred at the long-bite training, except to note that in her later-filed application for workmen's compensation, Plaintiff asserted

that her injuries were accidental.  *See generally* Defendant WMATA's Reply to Pl.'s Opp'n, ECF No. 16 [hereinafter Def.'s Reply], at 5; Def.'s Mot., Ex. 7, Empl. Comp. Form, ECF No. 14-7.

The day after the training exercise, Plaintiff went to a hospital where she was diagnosed with neck and back injuries.  Pl.'s Opp'n, Ex. 8, Medical Evaluation of Linda Elmore, ECF No. 15-9.  Plaintiff missed more than six months of work due to her injuries, and was unable to return to her duties as a K-9 officer until almost a year after the training exercise.  Pl.'s Stmt. ¶ 58; Def.'s Stmt. ¶ 58.

### B.     Procedural History

On November 2, 2012, Plaintiff filed a Formal Complaint with the Baltimore Office of the Equal Employment Opportunity Commission alleging discrimination based on age and gender, as well as retaliation.  *See generally* Formal EEOC Charge.  More than a year later, on March 7, 2014, Plaintiff received a Notice of Right to Sue from the EEOC.  Pl.'s Interrog. at 8.  On May 29, 2014, Plaintiff filed suit in this court, alleging:  (1) discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* [hereinafter Title VII] (Counts 1, 3, 4); (2) discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (Count 2); and (3) various common law tort claims against WMATA (Counts 5-11).  On July 10, 2014, the parties agreed to dismiss Counts 2 and 4-11 from the Complaint.  *See* Stipulation of Dismissal of Certain Counts of Plaintiff's Complaint, ECF No. 5.  Thus, only Plaintiff's counts for discrimination based on gender and retaliation in violation of Title VII are before this court.  *See id.*; Compl.

On July 17, 2015, following discovery, Defendant filed a Motion for Summary Judgment, in which it argued that Plaintiff was neither discriminated nor retaliated against, and that there was a legitimate, non-discriminatory reason that Plaintiff participated in the long-bite training exercise.

*See generally* Def.'s Mot.  One month later, on August 17, 2015, Plaintiff filed her Opposition to Defendant's Motion for Summary Judgment, claiming that the long-bite training exercise constituted both gender discrimination and retaliation in response to her protected behavior. *See generally* Pl.'s Opp'n.  On September 3, 2015, Defendant filed a Reply to Plaintiff's Opposition.  *See generally* Def.'s Reply.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court should grant summary judgment if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. Pro. 56(a)).  A material fact is one that is capable of affecting the outcome of litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, [ ] on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record that it believes "demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted) (footnote omitted).  The nonmoving party may oppose the motion using "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which [the

Court has] referred." *Celotex Corp.*, 477 U.S. at 324. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citations omitted). However, "to defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324). In other words, if the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Summary judgment, then, is appropriate when the non-moving party fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## IV.   DISCUSSION

The court first considers whether a reasonable jury could conclude that Plaintiff faced retaliation during the long-bite training exercise due to her protected activity. The court then turns to Plaintiff's claim that she was discriminated against on account of her gender during that training.

### A.   Plaintiff's Retaliation Claim

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). When a plaintiff proffers only indirect evidence of unlawful discrimination (as is the case here), courts analyze Title VII claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Weber v. Battista*, 494 F.3d 179, 182 (D.C. Cir. 2007). Under *McDonnell Douglas,* it is the plaintiff's burden to establish a *prima facie* case of discrimination by a preponderance of the evidence. *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (citation omitted). The burden of

establishing a *prima facie* case "is not onerous." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). In the context of an unlawful retaliation claim, as alleged here, "a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (footnote omitted). If the plaintiff establishes a *prima facie* case, the employer must then articulate a legitimate, nondiscriminatory reason for its actions. *Stella*, 284 F.3d at 144.

Once an employer sets forth a legitimate, non-discriminatory reason for the employment action, however, "the question whether the employee actually made out a *prima facie* case is no longer relevant, and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008) (citations and internal quotation marks omitted); *see also Nurriddin v. Bolden*, --- F.3d ---, No. 14-5156, 2016 WL 1319727, *6 (D.C. Cir. Apr. 15, 2016) ("At the summary judgment stage, once the employer has claimed a nondiscriminatory reason for its actions, this burden-shifting framework disappears."). At that point, the court must determine whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race" or some other prohibited ground. *Brady*, 520 F.3d at 494 (citations omitted); *Nurriddin*, 2016 WL 1319727 at *6 ("The 'one central inquiry' that remains is whether a reasonable jury could infer retaliation or discrimination from the evidence.") (citation omitted). Courts should consider this issue "in light of the total circumstances of the case," asking "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of

discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (citations omitted); *see also Nurriddin*, 2016 WL 1319727 at *6.

Although most discrimination cases that reach federal court contain no dispute that the employee has suffered an adverse employment action, *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), this is not such a case.  Defendant contends that Plaintiff has not suffered an adverse action and thus has not made out even a *prima facie* case of retaliation. Def.'s Mot., at 15.  Therefore, before asking whether a reasonable jury could infer retaliation from all of the evidence, the court must  determine whether plaintiff experienced the kind of adverse employment action protected by Title VII.

### *1.      Whether Plaintiff Suffered an Adverse Action*

"The antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67 (2006).  To come within the statute's protection against retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Id.* at 68.  In this context, an action is "materially adverse" if "it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks omitted) (citation omitted).  Thus, the standard is an objective one. *Id.* The Supreme Court nevertheless has emphasized that "context matters" when determining whether an action was adverse. *Id.* at 69.  "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of words used or the physical acts performed." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (2004)).

11

This is a novel case.  The parties have not cited, and the court was unable to find, an instance of retaliation comparable to this one, in which the claimed adverse action was to subject an employee to risk of physical injury during a job-related activity.  However, notwithstanding the seeming absence of a factually similar case, the court has little trouble concluding that Title VII protects employees against the kind of conduct that is alleged here.  An act intended to put an employee at risk of physical harm—even if occurring during the performance of a dangerous task within the scope of employment—is surely the kind of conduct that, if done with a retaliatory intent, could dissuade a reasonable worker from engaging in protected activity.  Indeed, safeguarding employees against acts intended to inflict physical punishment for their exercise of a protected right must rest squarely within Title VII's protections.

Here, Plaintiff claims that her fellow officers subjected her to physical harm by repeatedly requiring her to serve as a decoy in a long-bite exercise and, in doing so, to withstand multiple injurious blows from police canines.  Viewing the evidence in the light most favorable to Plaintiff, the evidence supports her claim that she suffered an adverse action.  Plaintiff's colleagues (and particularly Ludwig, with whom she had had a contentious history) were well aware of her protected EEO activity due to the interviews and mediation sessions that had occurred.  Those same colleagues demanded that Plaintiff continue with a dangerous training exercise, notwithstanding the obvious injury and distress caused by the dog attacks.  Her colleagues even rebuffed, between the second and third dog releases, an officer's offer to stand in for Plaintiff.  In other words, the officers were aware that she was in obvious distress, but forced her to continue.  Such actions, if they did in fact occur, surely are of the kind that would cause a reasonable person to hesitate before filing a complaint pursuant to an employer's harassment policy.  *See Burlington Northern*, 548 U.S. at 68.

2.      *Whether a Jury Could Infer Retaliation Based on the Record*

Having concluded that the evidence is sufficient to show that Plaintiff suffered a materially adverse action, the court now turns to evidence of retaliatory intent.  Defendant has proffered a legitimate, nondiscriminatory reason for Plaintiff's treatment, namely that all officers in the K-9 unit participate in long-bite training under similar circumstances.  Def.'s Reply, at 3-4.  Because Defendant has provided a legitimate reason for subjecting Plaintiff to the long-bite training, the burden-shifting framework of *McDonnell Douglas* is no longer relevant, and it is now up to the court to determine whether a reasonable jury could infer retaliation from all evidence presented by both parties.  *Nurriddin*, 2016 WL 1319727 at *6; *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  The court reiterates that, in doing so, it must consider the "three relevant categories of evidence—*prima facie*, pretext, and any other—to determine whether they either separately or in combination provide sufficient evidence for a reasonable jury to infer retaliation." *Jones*, 557 F.3d at 679 (internal quotation marks omitted) (citations omitted).

Taking Plaintiff's factual allegations as true and drawing all inferences in her favor, the court finds that a reasonable jury could infer that the maltreatment Plaintiff suffered during the long-bite training—and her resulting injuries—were in retaliation for her earlier protected activity.

*Prima facie case*.  Plaintiff has made out a *prima facie* case of retaliation.  It is indisputable that her filing of an EEOC complaint and her subsequent participation in the investigation and efforts to resolve her dispute with Ludwig were protected activity.  Furthermore, as already discussed, her treatment during the long-bite training exercise qualifies as a materially adverse action.

Plaintiff also has sufficiently shown that the adverse action was causally related to her exercise of rights.  "The causal connection component of the *prima facie* case may be established

13

by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (citations omitted).  In this case, Plaintiff filed an EEOC complaint against Officer Ludwig in August 2011, which resulted in a nine-month-long investigation, mediation, and reconciliation process.  Pl.'s Opp'n, Ex. 5.  *See Hamilton*, 666 F.3d at 1358 (holding that "courts should consider later protected activity in determining whether evidence of temporal proximity satisfies the causation element," not just the first statutorily protected activity).  The investigation's findings were highly critical of the K-9 unit's professionalism and culture and recommended a host of additional training.  Ludwig and the other K-9 officers surely were aware of Plaintiff's EEOC complaint and the criticism that resulted from it.  And, at a minimum, Ludwig was aware of Plaintiff's efforts to mediate and resolve her dispute with him, which continued into April 2012, approximately two months before the long-bite training exercise at issue.  That time period is short enough to make out a *prima facie* showing of causality.  *See id.* at 1359 (finding that, given the circumstances, a three-month time difference between initial protected activity and adverse employment action was sufficient to establish causation at the *prima facie* stage).

*Pretext.*  Plaintiff does not dispute Defendant's proffered non-discriminatory explanation that all K-9 officers participate as decoys during long-bite exercises.  Pl.'s Stmt. ¶ 42 (asserting that "[a]ll handlers participate as decoys"); Def.'s Stmt. ¶ 42 (responding "[n]o dispute").  Nor does she dispute that there is an inherent risk associated with being a decoy in the long-bite training, Pl.'s Stmt. ¶¶ 50-51; Def.'s Stmt. ¶¶ 50-51, or that the K-9 unit only has four protective suits that are bulky and uncomfortable for everyone, Pl.'s Stmt. ¶¶ 45, 52; Def.'s Stmt. ¶¶ 45, 52.

Her only retort to establish pretext is that "WMATA has not offered any reasons for requiring Ms. Elmore to engage in long-bite training with protective gear that did not fit, and

despite having no experience with the bite suit." Pl.'s Opp'n at 12.  Those assertions, however, do not show pretext.  Her contention that "[o]nly handlers who are trained to be decoys *should be* decoys," *id.* (emphasis added), is not evidence of pretext at all, but rather a policy suggestion that has no bearing on the court's present inquiry.  And her assertion that the protective gear did not fit does nothing to establish pretext in light of her concessions that all K-9 officers participate in long-bite training and the K-9 unit only had access to four bite suits.  Accordingly, Plaintiff has offered scant evidence to establish that Defendant's non-discriminatory explanation for why she served as a decoy is pretextual.

*Other evidence of retaliation.*  Lastly—and most importantly here—the court examines whether there is "any other" evidence that could suggest to a reasonable jury that Plaintiff faced retaliation.  *Jones*, 557 F.3d at 679.  This is a close case, but the court finds that a reasonable jury could infer retaliation based on the seemingly heartless and cruel treatment that Plaintiff experienced during the long-bite training itself.  In this case, it is *how* the long-bite training happened—not that it happened at all—that is troubling.

Despite showing obvious signs of distress and injury after the first dog attack—which rendered her momentarily unconscious—Ludwig and Hymans nevertheless subjected her to two additional blows from large police canines.  Formal EEOC Charge, at 3.  After the second attack, Plaintiff was in such clear anguish that another officer offered to take over for her, but Haymans told Plaintiff that she would have to go again.  *Id*.  A dog then charged and hit Plaintiff for a third time, again knocking her to the ground.  Only then did Plaintiff finally tell Ludwig and Haymans that she had had "enough abuse."  *Id*.  As a result of these multiple blows, Plaintiff suffered significant injuries to her neck and back, *see id*. (Plaintiff was told at the Hospital the day after the

training that "she had herniated disks at the T10 and T11 and bulging disks in her neck"), rendering her unable to serve as a K-9 officer for almost a year.  Def.'s Stmt. ¶ 58; Pl.'s Stmt. ¶ 58.

From the foregoing undisputed proof, as well as the evidence supporting her *prima face* case, the court finds that a reasonable jury could conclude that Plaintiff was mistreated and suffered injuries during the long-bite training exercise because of her protected activities.  A reasonable jury could find that Ludwig and Haymans used the long-bite training to "get back" at Plaintiff. She had filed an EEOC complaint and engaged in other protected activities that, only months prior to the long-bite exercise, cast a black eye on the K-9 unit in general and Ludwig individually.  A jury could infer that subjecting Plaintiff to additional dog attacks, despite her obvious distress after the first attack, was an effort to teach her a lesson.  Such inference is not at all unreasonable, especially given that Haymans refused another unit member's offer to replace Plaintiff as the decoy after the second attack.  In short, the court finds that, taking all evidence into account and drawing all inferences in Plaintiff's favor, a reasonable jury could find that the manner in which Plaintiff was treated when she served as a decoy during the long-bite training—and the injuries she suffered—were the result of a desire by her colleagues to retaliate against her engagement in protected activity.

Before proceeding to Plaintiff's gender discrimination claim, the court addresses two additional arguments that Defendant seems to make arising from Plaintiff's filing of a workmen's compensation claim.  First, Defendant appears to contend that any remedy under Title VII is foreclosed by Plaintiff's receipt of workmen's compensation.  Def.'s Reply at 6 ("Plaintiff has already sought and received the remedy provided to her by law.").  The court, however, declines to reach that argument, because Defendant raised it for the first time in its Reply brief.  *See Rafeedie v. INS*, 880 F.2d 506, 536 (D.C. Cir. 1989) (stating that "[w]e have even suggested that

it is proper to decline to reach an argument raised for the first time in an appellant's reply brief"). Second, Defendant seems to argue that, because Plaintiff characterized her injuries as arising from an "accident" when applying for workmen's compensation, her claim of retaliation is precluded. Def.'s Mot., at 15-16.   But whether there is a material difference between how Plaintiff characterized her injury on her workmen's compensation application and her retaliation claim is a question to be decided by a jury.   Defendant's Motion for Summary Judgment with respect to Plaintiff's retaliation claim is therefore denied.

### B.     Plaintiff's Gender Discrimination Claim

Under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   Nor may an employer "limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(2).

Defendant offers the same non-discriminatory reason to rebut Plaintiff's gender discrimination claim as it did with her retaliation claim—that all K-9 officers participate as decoys during the long-bite exercise.   As a result, the court moves directly to determining whether, taken together, all of the evidence on the record can support a reasonable inference of gender discrimination.   *See Nurriddin*, 2016 WL 1319727 at *6; *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007).

*Prima facie case*.   A plaintiff makes out a *prima facie* case of gender discrimination by establishing that (1) she is a member of a protected class; (2) she suffered an adverse employment

action; and (3) the adverse action gives rise to an inference of discrimination. *Czekalski*, 475 F.3d at 364. Here, the court finds that Plaintiff has not offered sufficient proof to establish that the alleged adverse action she suffered—injury during the long-bite training—occurred *because* she is a woman. *See Baloch*, 550 F.3d at 1196 (the "two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) *because* of the plaintiff's . . . sex") (emphasis added).

Plaintiff argues that she "has established a prima facie case of gender discrimination because she was forced to participate in the June 27, 2012, long-bite training exercise without proper equipment because she is a woman." Pl.'s Opp'n, at 14. The undisputed evidence, however, does not support that contention. The evidence shows that all members of the K-9 unit participated in long-bite training, even female officers. Pl.'s Stmt. ¶ 42; Def.'s Stmt. ¶ 42. It also shows that the K-9 unit only had four protective suits, Pl.'s Stmt. ¶ 45; Def.'s Stmt. ¶ 45; that the suits were meant to protect the officer acting as a decoy, Pl.'s Stmt. ¶ 52; Def.'s Stmt. ¶ 52; and that the suits were large and uncomfortable, *id.* In fact, both male and female officers in the K-9 unit testified that they had worn ill-fitting suits that made it difficult to move when acting as decoys. Ludwig Dep., at 108; Def.'s Mot., Ex. 4, Dep. of Officer Tia Blake, ECF No. 14-4, at 37. Thus, Plaintiff's service as a decoy while wearing an uncomfortable suit does not give rise to an inference of gender discrimination.

Nor has Plaintiff offered evidence from which a jury could infer that her mistreatment during the long-bite exercise, and her resulting injuries, occurred because of her gender. Plaintiff, for instance, has not pointed to any comparable instance in which a male K-9 officer was treated more favorably when showing signs of injury or distress during a long-bite training. Nor has she offered any direct evidence of gender animus rearing its head during the long-bite exercise itself.

*Pretext.*  As with her retaliation claim, Plaintiff has offered little evidence to demonstrate that her employer's explanation for subjecting her to the long-bite exercise in an ill-fitting suit was pretextual.  Again, WMATA asserts that all K-9 officers, regardless of their gender, participated in long-bite training and that the four available suits were used by all officers, again regardless of gender.  Def.'s Reply, at 4.  Plaintiff does not contend otherwise.  *See* Pl.'s Stmt. of Facts ¶¶ 42, 45; Def.'s Stmt. of Facts ¶¶ 42, 45.

Instead, she argues that there is a genuine dispute of material fact, created by her own testimony, as to whether she was *required* to participate in the long-bite training.  Pl.'s Opp'n, at 17 (citing Elmore Dep., at 95:13-22).  But that argument does not help Plaintiff.  Defendant does not contend that Plaintiff served as a decoy because of an expressly stated gender-neutral policy requiring her to serve in such a role.  If Defendant had made that argument, and Plaintiff had presented evidence demonstrating the absence of such a policy, that evidence could, in theory, have supported a finding of pretext.  But that is not the situation here.  Like all K-9 officers, regardless of gender, Plaintiff participated in long-bite training.  *See* Def.'s Reply, at 4; Ludwig Dep., at 113 ("Q: Did other people participate as decoys that day in June of 2012?  A:  Yes.  Q: Do you recall who they were?  A: All of us.").  And she did so apparently without objection.  Thus, Plaintiff's own testimony that no requirement mandated that she serve as a decoy does not undermine Defendant's gender-neutral explanation that Plaintiff, like all K-9 officers, voluntarily participated in the training.

*Other evidence.*  As discussed in the context of her retaliation claim, Plaintiff's colleagues' seemingly callous disregard for Plaintiff's well-being provides some evidence of discriminatory motive.  But such acts, standing alone, do not give rise to the reasonable inference that Plaintiff was mistreated *because of* her gender.  Plaintiff has not offered any evidence of gender animus

19

that arose during the long-bite training at issue. Nor has she offered any evidence that male K-9 officers were treated more favorably than female officers during long-bite trainings generally.

In short, having considered all of the evidence, the court finds that Plaintiff has not shown that a reasonable jury could "find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against" Plaintiff based on her gender. *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (citation omitted). As a result, the court grants Defendant's Motion for Summary Judgment with respect to Plaintiff's claim of gender discrimination.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies in part Defendant's Motion for Summary Judgment. Plaintiff's retaliation claim raises a genuine issue of material fact that cannot be resolved on summary judgment. The court finds no such issue with respect to her gender discrimination claim.

Dated: May 2, 2016

Amit P. Mehta
United States District Judge